IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EBONY CHAMBERS, in her own right and as Administratrix of the Estate of Rahsaan Chambers, deceased, and ROBERT TAYLOR,<br><br>         Plaintiffs,<br><br>v.<br><br>CITY OF PHILADELPHIA, BLANCHE CARNEY, NANCY GIANETTA, EDWIN CRUZ, ROBERT ROSE, STEVEN ANGELUCCI, JESSICA BOWERS, WALTER E. GRAY, III, MANYEAH BURNETT, SOJAN VARGHESE, WANDA MURCHISON, and C.O. JOHN/JANE DOES 3-10,<br><br>         Defendants. | CIVIL ACTION<br><br>NO. 23-0137 |

### MEMORANDUM OPINION

**Scott, J.**                               **February 29, 2024**

   This case is about the untimely death of 22-year-old Rahsaan Chambers. Mr. Chambers was incarcerated at the Curran-Fromhold Correctional Facility (CFCF) in Philadelphia on April 6, 2021, when he began to have trouble breathing. Allegedly, for about 24 hours, CFCF's staff ignored the many calls for medical attention made by Mr. Chambers and other people incarcerated on his cell block. When a guard finally checked on Mr. Chambers, Mr. Chambers was unresponsive in his cell. After nine days at Jefferson Torresdale Hospital, Mr. Chambers died from severe complications from what was determined to be a diabetic event.

1

The plaintiffs in this action are Mr. Chambers's mother, Ebony Chambers, who brings claims on her own behalf and on behalf of Mr. Chambers's estate, and Mr. Chambers's father, Robert Taylor, who brings claims on his own behalf. The plaintiffs bring various claims pursuant to 42 U.C.S. § 1983 and the state tort of intentional infliction of emotional distress against several groups of defendants. The supervisory defendants and the City have filed or joined a motion to dismiss the two counts of the amended complaint that are aimed only at them: Count II, a supervisory liability claim made against most of the supervisory defendants, and Count III, a *Monell* claim against the City. For the reasons set forth below, the motion to dismiss will be denied, but these arguments may be renewed at summary judgment.

## I.   BACKGROUND

Taking the allegations in the amended complaint as true, the relevant facts are as follows:

### A.   Mr. Chambers's Medical Emergency and Death

On April 6, 2021, Rahsaan Chambers was incarcerated at CFCF while awaiting a criminal trial. Am. Compl. ¶ 42, ECF No. 14. That evening, Mr. Chambers told Defendant Correctional Officer Sojan Varghese (C.O. Varghese) that he was having difficulty breathing and asked to be brought to the infirmary. *Id.* ¶ 43. C.O. Varghese did nothing—he refused to take Mr. Chambers to the infirmary, and he did not contact medical staff at CFCF or any other supervisory staff. *Id.* ¶¶ 44–46. After everyone was locked down for the night, Lewis Brown, who was incarcerated on Mr. Chambers's housing pod, told C.O. Varghese that Mr. Chambers was in respiratory distress and needed medical care. *Id.* ¶¶ 48–49. C.O. Varghese also ignored Mr. Brown's call for medical attention. *Id.* ¶¶ 50–52. C.O. Varghese also did not check on Mr. Chambers. *Id.* ¶ 53.

The following morning, Mr. Chambers did not leave his cell. *Id.* ¶ 54. Throughout that day, inmates incarcerated on Mr. Chambers's cell block informed C.O. Wanda Murchison and several

C.O.s whose identities are currently unknown (listed as Defendant C.O.s John/Jane Doe 3 through 10) that Mr. Chambers was bedridden and had been having serious breathing difficulties since the previous night. *Id.* ¶¶ 57–59. None of the C.O.s checked on Mr. Chambers. *Id.* ¶ 60. That evening, others incarcerated on Mr. Chambers's cell block kicked their doors and yelled out for medical aid in a collective effort to get CFCF staff members' attention. *Id.* ¶ 61. One of the John/Jane Doe C.O.s checked on Mr. Chambers and found him lying unresponsive on his cell cot. *Id.* ¶ 62.

Finally, more than 24 hours after Mr. Chambers's initial complaint to C.O. Varghese, and about 12 hours after C.O. Murchison's shift began, medical personnel arrived at Mr. Chambers's cell. *Id.* ¶ 63. Registered Nurse Sarah DeRose noted that Mr. Chambers was in severe respiratory distress, and his heart rate, blood sugar, and oxygen saturation were at emergency levels. *Id.* ¶¶ 64–65. R.N. DeRose gave Mr. Chambers insulin, applied a non-rebreather mask to address Mr. Chambers's depressed oxygen saturation, and ensured that 911 was called. *Id.* ¶ 66. Mr. Chambers was transported to the emergency room at Jefferson Torresdale Hospital, where he was diagnosed with diabetic ketoacidosis, which is akin to a state of diabetic shock. *Id.* ¶¶ 67–68. For a few days, he was conscious and able to provide some limited answers to questions posed by medical staff. *Id.* ¶ 69. But beginning on April 11, 2021, Mr. Chambers required intubation for breathing assistance, suffered cardiac arrest, and fell into a vegetative state. *Id.* ¶¶ 71–73. On April 16, 2021, Mr. Chambers died from medical complications associated with diabetic ketoacidosis. *Id.* ¶ 74.

The plaintiffs allege that if Mr. Chambers had received prompt emergency medical treatment when he initially requested it, his diabetic condition could have been stabilized without the more severe complications. *Id.* ¶¶ 75–76.

B.  **Allegations Supporting Policy and Custom**

The amended complaint additionally alleges that at the time of Mr. Chambers's medical

emergency, CFCF personnel were required to follow a written policy requiring that medical care be immediately summoned for incarcerated people suffering from respiratory distress. *Id.* ¶ 77. Notably, a federal class action was filed in April 2020, and on June 3, 2020, the City entered into a partial settlement agreement that was reduced to a consent order, in which it promised in relevant part to:

> [continue] to ensure access to necessary services by . . . [p]roviding medically-necessary medical care for non-COVID-19-related medical and mental health needs based on protocols and directives in effect pre-COVID-19, with discretion to provide medical and mental health care services in the housing units.

*Id.* ¶ 104 (quoting Consent Order, ECF No. 35 at 3–4, *Remick v. City of Philadelphia*, 2:20-cv-01959-BMS (E.D. Pa.)).

However, the amended complaint alleges that the written policy and consent order were ignored in Mr. Chambers's particular case, and "it was a custom or *de facto* policy to ignore such medical emergencies." *Id.* ¶ 78. The amended complaint lists at least seven other incidents at CFCF in which incarcerated people allegedly died or experienced serious injuries due to CFCF personnel's failures to promptly respond to medical emergencies. *Id.* ¶ 99.[1] The plaintiffs also cite a joint status report filed in the *Remick* lawsuit approximately three weeks after Mr. Chambers's medical emergency, which reported that conditions had continued to deteriorate at CFCF, including in "[d]elays in getting routine and emergency medical care." *Id.* ¶ 105.

### C. Parties and Claims

As previously mentioned, the plaintiffs in this suit are Mr. Chambers's mother, Ebony

---

[1] One incident allegedly involved a person who was incarcerated "in the PDP"; seven incidents allegedly occurred at CFCF; and the plaintiffs also cite an allegation in a federal suit filed on January 7, 2022, that there had been "consistent reports of incarcerated people describing experiencing chest pain, seizures, diabetic shock, and panic attacks in their cells, while their urgent calls for medical attention went ignored." Am. Compl. ¶ 99.

4

Chambers, who brings claims on her own behalf and on behalf of Mr. Chambers's estate, and Mr. Chambers's father, Robert Taylor, who brings claims on his own behalf.

The defendants in this matter can be separated into three groups. First, there is a group of correctional officers that includes named defendants C.O. Varghese and C.O. Wanda Murchison, and up to eight additional John and Jane Doe C.O.s (collectively, "the C.O. defendants"). The plaintiffs raise two claims against the C.O. defendants: a § 1983 claim of pretrial punishment in violation of the Fourteenth Amendment, and a Pennsylvania state law claim of intentional infliction of emotional distress (Counts I and IV, respectively). These claims are not at issue in the defendants' motion to dismiss.

Second, there is a group of supervisory personnel at CFCF and the Philadelphia Department of Prisons (PDP) that includes (1) Blanche Carney, the Commissioner of the PDP; (2) Nancy Gianetta, the Warden of CFCF; (3) Edwin Cruz, the Deputy Warden for Administration at CFCF; (4) Steven Angelucci, the Deputy Warden for Operations at CFCF; (5) Robert Rose and (6) Jessica Bowers, who are both titled the Deputy Warden for Classification, Movement, and Records and Administration at CFCF; and (7) Walter E. Gray, III and (8) Manyeah Burnett, who were the highest-ranking officers on duty at CFCF during the alleged events on April 6 and 7, 2021 (collectively, "the supervisory defendants").[2] *See* Am. Compl. ¶¶ 26–34. The plaintiffs raise a supervisory liability claim under § 1983 against these supervisory defendants (Count II).

Third, the plaintiffs raise a municipal liability claim (or *Monell* claim) under § 1983 against the City (Count III).

---

[2] The amended complaint also references a "Captain Doe," but this may be a typographical error, because according to the docket, a Captain John/Jane Doe was terminated as a defendant on March 1, 2023. *Compare* Am. Compl. ¶ 92 & p. 23 *with* Caption of Docket 2:23-cv-00137-KNS.

### D.    Procedural History

The plaintiffs filed an initial complaint on January 12, 2023, and an amended complaint on March 1, 2023. *See* Compl., ECF No. 1; Am. Compl., ECF No. 14. On March 15, 2023, Defendants Carney, Cruz, Gianetta, and the City moved to dismiss the amended complaint. *See* Mot. to Dismiss Am. Compl., ECF No. 16 ("Mot. to Dismiss"). On March 20, 2023, Defendant Bowers moved to adopt the motion to dismiss, and on April 25, 2023, Defendants Angelucci, Burnett, Gray, and Rose moved to adopt the motion to dismiss. *See* Def. Bowers's Mot. to Adopt, ECF No. 18; Mot. of Defs. Rose, Angelucci, Gray, & Burnett to Adopt, ECF No. 31. The Court granted the motions to adopt on April 20, 2023, and April 26, 2023, respectively. *See* Order, ECF No. 30; Order, ECF No. 33. Meanwhile, on March 31, 2023, the plaintiffs responded to the motion to dismiss, and on April 10, 2023, the moving defendants filed a reply in support of their motion to dismiss. *See* Resp. Opp'n to Defs.' Mot. to Dismiss, ECF No. 24 ("Response"); Reply Memo. of Law in Further Supp. of Mot. to Dismiss, ECF No. 27 ("Reply"). C.O.s Varghese and Murchison answered the amended complaint on May 4, 2023. *See* Answer to Am. Compl., ECF No. 34. The Court held an initial pretrial conference on July 25, 2023, where it informed the parties that the motion to dismiss would be denied, with an order and opinion to follow, and directed the parties to proceed with discovery. *See* Scheduling Order, ECF No. 41.

## II.    <u>STANDARD OF REVIEW</u>

A complaint survives a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). District courts in the Third Circuit use a three-step process to evaluate a motion to dismiss a complaint for failure to state a claim for relief. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022)

6

(relying on framework established in *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787–90 (3d Cir. 2016) and *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009)). First, the court articulates the elements of the claims raised. *See id.* Second, the court reviews the complaint and disregards any allegations that are merely conclusory or formulaic recitations of elements of the claim or that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *See id.* at 327–28 (internal citations omitted). Third, the court considers whether the remaining allegations plausibly entitle the plaintiffs to relief. *See id.* at 328. To do so, the court must assume that all well-pleaded factual allegations are true, construe the allegations in the light most favorable to the plaintiffs, and draw all reasonable inferences in the plaintiffs' favor. *See id.*

The plausibility standard does not require the complaint to establish a probability of relief or to demonstrate that all prima facie elements of a claim can be met. *See Ashcroft*, 556 U.S. at 678; *Fowler*, 578 F.3d at 210–11. Instead, a complaint plausibly pleads a claim if it raises "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft*, 556 U.S. at 678, or a "reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." *Lutz*, 49 F.4th at 328 (internal quotations omitted).

### III. DISCUSSION

Section 1983 provides recourse when an actor operating "under color of state law" deprives a person of "any rights, privileges, or immunities secured by the Constitution and [federal] laws." *See* 42 U.S.C. § 1983; *see also West v. Atkins*, 487 U.S. 42, 48 (1988). Here, the defendants do not argue that the plaintiffs are unable to state a plausible claim for relief under § 1983 against the individual C.O.s who allegedly ignored or failed to learn of Mr. Chambers's medical emergency. Instead, the motion to dismiss challenges only the § 1983 claims pleaded against the City and the supervisory defendants. For the reasons set forth below, the Court finds that the plaintiffs have

adequately pleaded their claims based on theories of municipal liability and supervisory liability.

### A.     Municipal Liability Claim (Count III)

#### 1.     Applicable Law

A municipality can be held liable for the unconstitutional acts of its employees only if a plaintiff pleads and proves a *Monell* claim, which requires showing that the municipality's policy or custom caused the violation of federal rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978). The Third Circuit recognizes two pathways for a *Monell* claim: Plaintiffs may either show that (1) "an unconstitutional policy or custom of the municipality led to [their] injuries" or (2) the injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (internal quotations and citations omitted).

The first type of claim—a claim that the municipality's unconstitutional or custom led to the plaintiff's injuries—can by proven by showing either that (1) the municipality's policy or custom itself violates federally protected rights or (2) the policy or custom was the "moving force" behind a municipal employee's deprivation of federally protected rights. *See Thomas v. Cumberland Cnty*, 749 F.3d 217, 222 (3d Cir. 2014) (internal citation omitted).[3] There must be some "affirmative link" between the policy or custom and the alleged constitutional violation. *See Estate of Roman*, 914 F.3d at 798 (internal citation omitted). For instance, an affirmative link can be drawn between a custom and the alleged constitutional violation by showing that (1) the municipality or its final policymaker(s) knew that similar unlawful conduct had occurred in the

---

[3]     A "policy" is made by a "decisionmaker possess[ing] final authority" to establish policy for the municipality and comes in the form of an "official proclamation, policy, or edict." *See Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (internal quotations and citation omitted). A "custom" is a "given course of conduct, although not specifically endorsed or authorized by law, [that] is so well-settled and permanent as virtually to constitute law." *See id.* (internal quotations and citation omitted).

past, (2) but failed to take precautions against future violations, and (3) these failures contributed to the plaintiff's injury. *See id.* (internal citation omitted).

The second type of claim is often framed in terms of the municipality's failure to train, supervise, or discipline its employees. Plaintiffs raising a "failure to" claim (such as a claim alleging a failure to train, supervise, or discipline) need not identify a specific unconstitutional policy or custom. *See Forrest*, 930 F.3d at 105. Instead, the plaintiffs must show that "the failure . . . amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact." *Reitz v. Cnty of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (evaluating failure-to-train claim); *see also Forrest*, 930 F.3d at 106 (applying this standard to any type of failure to claim). Deliberate indifference is a higher bar than mere knowledge; it "require[s] proof that a municipal actor disregarded a known or obvious consequence of [their] action." *See Thomas*, 749 F.3d at 223 (citation omitted). Plaintiffs sufficiently plead that the municipality's failure to train, supervise, or discipline its employees amounted to deliberate indifference by demonstrating that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Doe v. Luzerne Cnty*, 660 F.3d 169, 179–180 (3d Cir. 2011) (internal quotations and citations omitted) (applying standard to failure-to-train claim); *see also Forrest*, 930 F.3d at 106 (applying same standard to any type of failure to claim).

    2.    <u>Analysis</u>

A few paragraphs in the amended complaint may seem vague when read in isolation, but

the amended complaint as a whole plausibly pleads that a custom[4] exists of C.O.s failing to adequately respond to medical emergencies at CFCF.[5] The City misunderstands the scope of the plaintiffs' alleged custom by characterizing it as "nebulous, overbroad, and extraordinarily high-level." Mot. to Dismiss at 6 (quoting Am. Compl. ¶ 141).

Count III of the amended complaint alleges that the City "maintained a custom, policy, or practice of failing to respond adequately – or at all – to the medical emergencies of those incarcerated in the PDP in general and CFCF in particular." Am. Compl. ¶ 141. Additionally, the City "failed to supervise correctional staff, by appropriate training and discipline, for failing to respond adequately – or at all – to the medical emergencies of those incarcerated in the PDP in general and CFCF in particular." *Id.* ¶ 142. The plaintiffs more vaguely allege that the City failed to "adopt necessary and appropriate policies." *Id.* ¶ 143. While these three paragraphs are indeed broad, there are pages of detailed allegations supporting these claims throughout the amended complaint. *See, e.g., id.* ¶¶ 77–96 (outlining supervisory liability theories); ¶¶ 97–107 (alleging supervisors' knowledge of similar issues and their failures to address them); ¶¶ 108–09 (alleging that supervisory defendants created a "permissive environment" in which C.O.s believed that supervisors would not closely monitor or discipline C.O.s' lapses in addressing serious medical

---

[4] Though the plaintiffs use general "custom, policy or practice" phrasing, the plaintiffs make no allegations that Commissioner Carney issued an official policy or edict to this effect. Rather, the plaintiffs' allegations sound in "custom" language—the conduct challenged as unconstitutional is described as a well-settled course of conduct that virtually constitutes law. *See supra* note 3 (defining policy and custom). The Court's use of "custom" language throughout this opinion does not foreclose the plaintiffs from later identifying an official policy or edict.

[5] The Court elects to refer only to CFCF, unless specifically discussing Commissioner Carney or the City. Notably, aside from Commissioner Carney, all other supervisory defendants are only alleged to work at CFCF. *See* Am. Compl. ¶¶ 26–35. Although the plaintiffs attribute the custom to PDP generally, and CFCF specifically, *see id.* ¶ 141, this is not a class action lawsuit, and the allegations about Mr. Chambers's tragic death are not generalizable to other facilities in the PDP. This terminology is not used with an intention to limit the plaintiffs' discovery or legal theories narrowly to CFCF; the Court will approach any such issues on a case-by-case basis.

needs).

In context, the plaintiffs do not simply plead that the City has broadly failed to "meet its general constitutional duty to provide adequate medical care to those with serious medical needs." *See* Mot. to Dismiss at 6. Instead, the plaintiffs more narrowly focus on the scenario in which an incarcerated person (1) cannot directly seek medical attention, (2) reports or exhibits symptoms that a C.O. without specialized medical training should understand to indicate a potential medical emergency, and yet (3) is ignored or unnoticed by C.O.s until it is too late for medical professionals to offer adequate medical care. In other words, the plaintiffs assert that C.O.s at CFCF inadequately triage medical complaints and fail to flag potential medical emergencies for medical professionals.

The plaintiffs' framing is not nebulous, overbroad, or high-level if we consider what the plaintiffs are *not* alleging: The plaintiffs do not challenge *any* decisions made by people with medical training—the amended complaint includes allegations about how R.N. DeRose and emergency medical staff treated Mr. Chambers, but it raises no issues regarding that treatment. *See* Am. Compl. ¶¶ 64–74. Indeed, the plaintiffs' theory is that medical professionals could have prevented Mr. Chambers's death if they had had timely knowledge of his symptoms. *Id.* ¶¶ 75–76. Additionally, the amended complaint is narrowly concerned with medical emergencies, which the Court understands to apply to health issues that must be addressed relatively quickly to prevent serious injury or death. The plaintiffs do not attack the very broad range of physical ailments that are not medical emergencies but that may fall within a correctional facility's provision of adequate medical care. *See, e.g., id.* ¶¶ 35, 91, 95 (all narrowly focusing on emergency medical care).

Nor is the plaintiffs' *Monell* claim nebulous or overbroad in comparison to Third Circuit precedent that reversed district courts' dismissals of *Monell* claims. In *Estate of Roman v. City of Newark*, the Third Circuit partially reversed a district court's decision to grant a motion to dismiss,

11

finding that the plaintiff had adequately pleaded a *Monell* claim based on allegations of "a custom of warrantless or nonconsensual searches" by an entire police department and the city's failure to properly train its officers to understand the Fourth Amendment. *See Estate of Roman*, 914 F.3d at 798–800. And in *Thomas v. Cumberland County*, the Third Circuit reversed a district court's dismissal of a *Monell* claim at summary judgment, holding that reasonable jurors might find that a county's failure to provide de-escalation and intervention training to its corrections officers amounted to deliberate indifference to serious injuries inflicted during a prison fight. *See Thomas*, 749 F.3d at 225–27. Here, the alleged custom—C.O.s' failures to adequately respond to the medical emergencies of those incarcerated at CFCF—appears to be narrower in scope than an entire police force's failure to respect citizens' Fourth Amendment rights during searches, and it is similar in scope to C.O.s' failures to address potential violent conflicts between people incarcerated in a correctional facility.

Moreover, the plaintiffs' broad framing matches the magnitude of the failure that they have alleged: The plaintiffs' allegations paint a picture of a group of rank-and-file government employees collectively failing to do anything to address Mr. Chambers's medical emergency for about 24 hours. It is difficult to imagine how else the plaintiffs could have framed their concerns than to bluntly and broadly allege that the C.O.s at CFCF have adopted a custom of willful ignorance of emergency medical situations.

The defendants repeatedly invoke *Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60 (3d Cir. 2011),[6] to support an argument that the plaintiffs need to identify particular

---

[6] In *Argueta*, nine New Jersey residents challenged the national federal policy known as "Operation Return to Sender," which spurred Immigration and Customs Enforcement (ICE) agents to drastically scale up arrest numbers of suspected undocumented immigrants, causing what the plaintiffs alleged to be unlawful and abusive raids of their homes. *See Argueta*, 643 F.3d at 62–65. The plaintiffs sued high-level executives in the Department of Homeland Security (DHS), alleging broadly that they failed to properly train or implement guidelines or oversight mechanisms to

"necessary and appropriate" policies that the City failed to adopt. *See* Mot. to Dismiss at 8; Reply at 10. However, *Argueta* is inapplicable here. The *Argueta* Court emphasized that the plaintiffs' challenges to national federal policy and the only allegations directed at the high-level supervisory defendants "described conduct consistent with otherwise lawful behavior."[7] *See Argueta*, 653 F.3d. at 75. No clear line could be drawn from the executives' policy down to the individual federal agents who allegedly violated the plaintiffs' Fourth and Fifth Amendment rights during raids of homes, absent more concrete examples of what policy or training those executives could have enacted to safeguard the plaintiffs' Fourth and Fifth Amendment rights. *See id.* at 75–76. Here, unlike *Argueta*, if the plaintiffs can prove that a custom existed in which C.O.s regularly failed to timely address the medical emergencies of people incarcerated at CFCF, then there will be a very obvious nexus between that custom of inadequate medical treatment and the alleged violation of Mr. Chambers's constitutional right to adequate medical treatment. Therefore, *Argueta* would not require these plaintiffs to better articulate what policies the City should have adopted instead of whatever (currently unknown) policies the City did adopt.

Furthermore, the City repeatedly misstates the law in its efforts to minimize the plaintiffs' discussion of many other deaths and serious injuries at CFCF and a consent order that the City

---

ensure that ICE agents conducted home searches without breaching Fourth and Fifth Amendment rights, and were instead "proudly publiciz[ing] the increasing numbers of arrests." *Id.* at 65. The *Argueta* Court held that the allegations were insufficient to state a supervisory liability claim against the DHS executives, in part because the plaintiffs "did not really identify in their pleading what exactly Appellants should have done differently, whether with respect to specific training programs or other matters, that would have prevented the unconstitutional conduct." *See id.* at 74–75.

[7] The *Argueta* Court noted that "a federal official specifically charged with enforcing federal immigration law appears to be acting lawfully when he or she increases arrest goals, praises a particular enforcement operation as a success, or characterizes a home entry and search as an attempt to locate someone." *Argueta*, 643 F.3d at 75.

voluntarily entered in a lawsuit primarily focused on unconstitutional conditions of confinement during the early months of the coronavirus pandemic. The Court declines the City's invitation to dismiss a *Monell* claim at the pleadings stage if plaintiffs do not demonstrate "a high degree of similarity" between prior incidents that are alleged to be similar to the plaintiffs' alleged harm. *See* Mot. to Dismiss at 8.[8] The City also erroneously asserts that this Court must restrict its analysis of the plaintiffs' claims only to similar incidents that occurred *before* Mr. Chambers's medical emergency.[9] In *Forrest v. Parry*, the Third Circuit held in relevant part that a district court abused its discretion by excluding subsequent incidents from its analysis of *Monell* claims regarding police misconduct. 930 F.3d at 115. Importantly, the *Forrest* Court reasoned that incidents that occurred after the plaintiff's arrest could not prove causation, but they could be "highly relevant to whether Camden was deliberately indifferent to a continued pattern of police misconduct." *See id.* The Third Circuit also reiterated its prior finding that police misconduct that occurred shortly after the plaintiff's arrest could "support an inference that policymakers knew of the officer's 'propensity

---

[8] None of the City's cited decisions adopted such a drastic measure. *Siceloff v. Twp. of West Deer*, No. 11-cv-00783, 2013 WL 3989427, at *13 (W.D. Pa. Aug. 2, 2013), which dismissed a *Monell* claim at *summary judgment*, mentions a "high degree of similarity" only after (1) a detailed rejection of *other* possible pathways to proving a failure-to-train claim, and (2) a reasonable explanation that *two* prior excessive force claims would need to have a high degree of similarity to the plaintiff's excessive force claim to have put the township on notice that it needed to address the particular excessive force issues that the plaintiff alleged.
 The other cited cases required *some* degree of similarity between prior and alleged incidents—not a *high* degree of similarity. *Cf. Lesher v. Zimmerman*, 822 F. App'x 116, 121 (3d Cir. 2020) (not setting any standard for similarity between incidents in motion to dismiss, but noting that prior incidents were not similar to alleged school sports safety issue because they either involved different sports with different coaches or unrelated complaints against the same coach); *Abdul-Jabbar v. City of Phila.*, No. 21-cv-2077, 2022 WL 329576, at *2 (E.D. Pa. Feb. 3, 2022) (observing "little" similarity between alleged police misconduct and prior instances, which "include[d] everything from offensive social media posts to unjustified shootings").

[9] *See, e.g.*, Mot. to Dismiss at 12 ("Plaintiffs cannot rely on allegations regarding events post-dating the decedent's initial hospitalization to satisfy the deliberate-indifference requirement."). The City cites only nonprecedential cases published before *Forrest* to support this erroneous proposition.

14

for violence when making arrests.'" *Id.* (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996)).

The Court finds that the plaintiffs' allegations of similar incidents, *see supra* Section I.B, increases the plausibility of the plaintiffs' unconstitutional custom, failure-to-train, and failure-to-supervise theories at this early stage of litigation, and the Court expects to see more granular argument about the degree of similarity between incidents at summary judgment. Even if this Court were to ignore any of the allegedly similar incidents that occurred after Mr. Chambers's death, the plaintiffs have alleged four examples of apparent medical emergencies at CFCF that predated Mr. Chambers's medical emergency and either (1) ended with the incarcerated person's death or (2) became the subject of a lawsuit against CFCF and PDP officials.[10] This alone lends plausibility to the allegations that Commissioner Carney was aware of prior situations in which C.O.s failed to notice or address severe injuries and deaths that perhaps could have been prevented by prompt medical attention. Although the cited medical emergencies may have been different types of medical complaints, and the legal complaints filed after those incidents may have raised different legal theories, that does not compel the Court to reject them outright as too dissimilar to have any probative value.[11] More importantly, the incidents resulting in death and federal lawsuits may be

---

[10]   It is plausible that Commissioner Carney would be aware of incidents that result in deaths of people incarcerated in PDP facilities or lawsuits against PDP. The four incidents are the deaths of Jonathan Gleaves, Jr., Armani Faison, and an unnamed person who committed suicide in 2020, and the serious injuries of Ameen McCall (which did not end with Mr. McCall's death but were presumably made known to Commissioner Carney in a lawsuit filed on June 3, 2019). *See* Am. Compl. ¶ 99.

[11]   Theoretically, if the C.O.s *did* ignore these incidents until it was too late to save the injured incarcerated people from irreparable injury or death, then it might not matter if the source of the injury was a reported respiratory issue, a vicious rape and beating, or a suicide. It would likely be more important to show similarities in the obviousness of each emergency to a layperson, the C.O.s' responses to each emergency, and the modifications to training or policy that would have enabled C.O.s to prevent the dire results of each emergency.

only the tip of the iceberg—these might just be the incidents that are publicly known. The reports filed in the *Remick* case (the case that resulted in a partial settlement agreement memorialized in a consent order) lend support to the plaintiffs' allegations that, very close to the time of Mr. Chambers's medical emergency, the City and Commissioner Carney were aware of CFCF's delayed provisions of emergency medical care.

All arguments considered, the plaintiffs have adequately pleaded their *Monell* claim based on a "custom" theory. They only need to show at this point that there is more than a sheer possibility that (1) Commissioner Carney knew prior to April 6, 2021, that similar unlawful conduct had occurred where C.O.s at CFCF failed to learn of or adequately address medical emergencies that would have been obvious to people without medical training, (2) Commissioner Carney failed to take precautions against future violations, and (3) these failures contributed to Mr. Chambers's death. First, the prior incidents alleged are similar enough to Mr. Chambers's medical emergency to satisfy the Court that they all might reflect medical emergencies that would have been obvious to people without medical training, and yet they all went unaddressed until it was too late to provide adequate medical care. The defendants may, of course, argue at summary judgment that these incidents are *not* similar, but they are at least similar enough to warrant discovery. Second, it is not yet clear what Commissioner Carney did or did not do after learning of these prior unaddressed (or belatedly addressed) medical emergencies, but it is reasonable for the plaintiffs to believe that information is discoverable. Third, it will be up to the plaintiffs to prove that failures to take specific precautions after these incidents contributed to Mr. Chambers's death. Overall, this is a plausible custom theory that survives a motion to dismiss.

Additionally, the Court finds that the plaintiffs have adequately pleaded a failure-to-train or failure-to-supervise theory, based on the limited information known to the plaintiffs. The Court

easily finds that (1) Commissioner Carney should have expected that C.O.s at CFCF would confront situations in which incarcerated people would report possible medical emergencies, (2) that these choices may be difficult or complex, and (3) the wrong choice—the failure to identify and address a medical emergency—would frequently lead to preventable serious injury or death, in violation of the Eighth Amendment right that incarcerated people have access to adequate medical care. Thus, if the plaintiffs are able to identify training that did not occur or that was deficient, it is plausible that they will be able to prove that the City was deliberately indifferent.

The plaintiffs do not speculate in their amended complaint about what training and supervision C.O.s at CFCF received regarding their responses to incarcerated peoples' reports of medical emergencies. However, it is reasonable for the plaintiffs to expect that discovery can reveal this information. If *no* relevant training existed, then this case is even more analogous to *Thomas v. Cumberland County*, where the Third Circuit found that failure to provide C.O.s with de-escalation training could be a basis for single-incident municipal liability (*i.e.*, liability that arises when the need for training is so obvious that the failure to provide it could be characterized as deliberate indifference even without a pattern of constitutional violations). *See Thomas*, 749 F.3d at 223–25. And if some training occurred, it will be up to the plaintiffs to craft an argument that the training was inadequate to a degree that reflects Commissioner Carney's deliberate indifference to the realities that particular medical emergencies would occur at CFCF. It is possible that C.O.s received excellent training and ignored it, or that Commissioner Carney required that training, but her orders were not carried out—but that can only be revealed through discovery and further argument.

Finally, for similar reasons—namely, the plaintiffs' lack of access to information about supervisory decisions within the PDP or CFCF—the plaintiffs have stated a plausible failure-to-supervise theory, with one caveat that is further addressed below.

B. **Supervisory Liability Claim (Count II)**

The Third Circuit generally recognizes two situations in which supervisors may be found liable for their subordinates' unconstitutional conduct: First, plaintiffs may show that a supervisor directly participated in the violation of the plaintiff's rights, directed others to violate those rights, or "had knowledge of and acquiesced" to the unconstitutional conduct. *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds*, *Taylor v. Barkes*, 575 U.S. 822 (2015). Second, plaintiffs can demonstrate that a supervisor established and maintained a policy, practice or custom that directly caused a deprivation of a federal right, and that the supervisor acted with "deliberate indifference" to those consequences. *See id.*

"Failure to" claims are a subcategory of policy or practice liability. *See id.* Specifically, to prove a failure-to-supervise claim, the plaintiff must:

> identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

*See id.* at 317 (test initially developed in *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). When the alleged underlying constitutional violation is a denial of adequate medical care that violates the Eighth Amendment's prohibition on cruel and unusual punishment, a supervisor may be individually liable if she has acted with "deliberate indifference to *known* deficiencies in a government policy or procedure," thereby "allow[ing] to develop an environment in which there

18

is an unreasonable risk that a constitutional injury will occur." *See id.* at 319–20.

Here, the defendants raise one argument regarding the plaintiffs' supervisory liability claim that is not repetitive of their municipal liability arguments above: The plaintiffs have impermissibly lumped all of the supervisory defendants together to make boilerplate supervisory liability claims. *See* Mot. to Dismiss at 14–16; Reply at 9–10. This is certainly a closer issue, but again, this argument is premature. For each supervisory defendant, the plaintiffs have alleged (1) what that person's role is in the PDP or at CFCF and (2) why the plaintiffs believe that person was responsible for implementing policy, training, or supervision "concerning the proper responses to the emergent medical needs of persons incarcerated in CFCF." *See* Am. Compl. ¶¶ 26–35. It is plausible for the plaintiffs to assume that *any and all* of the supervisory defendants may have some degree of responsibility for developing or implementing policy or training or providing supervision regarding C.O.s' responses to the emergent medical needs of people incarcerated in CFCF. *See Barkes*, 766 F.3d at 322 ("Under the Eighth Amendment, prison officials, from the bottom up, may be liable if by act or omission they display a deliberate indifference to a known risk of substantial harm to an inmate's health or safety."). Furthermore, for reasons addressed more thoroughly at Section III.A.2, *supra*, the plaintiffs have plausibly alleged that other elements of the *Sample* test could be met here—the plaintiffs raise a logical deliberate indifference argument, and discovery will reveal whether it is merely a plausible but improvable theory, or whether a factfinder could conclude that supervisory officials at CFCF and PDP exhibited deliberate indifference toward the incarcerated people in their care by failing to adequately train or supervise C.O.s to respond to medical emergencies.

However, the plaintiffs are advised that these claims will not survive summary judgment if their allegations remain lumped together, or if the claims against any one defendant are tenuous

or vague,[12] and the Court directs the plaintiffs to provide adequate notice at the close of discovery of what specific allegations they intend to make against each supervisory defendant. This notice is especially important in the supervisory liability context, because unlike the City, supervisory defendants sued in their individual capacities may raise qualified immunity defenses. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 657 (1980). Consequently, the Court will depart from its normal policies for summary judgment in this case, as outlined in the order accompanying this memorandum, to ensure that the defendants are able to assert any immunity claims without filing piecemeal arguments at summary judgment.

## IV. CONCLUSION

For all of these reasons, the plaintiffs have adequately stated plausible § 1983 claims of municipal liability and supervisory liability. Therefore, the City and supervisory defendants' motion to dismiss these claims is denied, with the caveat that the plaintiffs are to provide more detailed information supporting their supervisory liability claims at the close of discovery, as further outlined in the order accompanying this memorandum.

BY THE COURT:

_Kai N. Scott_
**HON. KAI N. SCOTT**
**United States District Court Judge**

---

[12] *See, e.g., McCloskey v. Welch*, 803 F. App'x 578, 583 (3d Cir. 2020) (affirming award of summary judgment on supervisory liability claim where only facts specific to supervisory defendant was that the supervisor reviewed plaintiff's administrative grievances about alleged medical care deficiencies).